2023 IL App (1st) 192306-U

FIRST DISTRICT,
FIRST DIVISION
January 9, 2023

No. 1-19-2306

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CR 10568 |
| | ) | |
| CORDARIUS LAWRENCE, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Hyman specially concurred, joined by Justice Pucinski.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence for first degree murder is affirmed where he was proven guilty beyond a reasonable doubt, the prosecutor did not commit reversible error during closing argument, and the circuit court did not abuse its discretion in sentencing defendant to a total of 100 years' imprisonment.

¶ 2    Following a jury trial, defendant Cordarius Lawrence was found guilty of first degree murder and of personally discharging a firearm that proximately caused the death of Corey Williams. The circuit court sentenced defendant to 50 years' imprisonment for the murder and an additional 50 years' imprisonment for the mandatory firearm enhancement, for a total of 100 years' imprisonment. On appeal, defendant argues that: (1) he was not proven guilty beyond a reasonable

doubt, (2) the prosecutor made improper remarks during closing argument, and (3) his 100-year sentence was excessive in light of mitigating evidence. For the reasons that follow, we affirm.

¶ 3                                                    BACKGROUND

¶ 4        In the early morning hours of February 6, 2014, Corey Williams was shot in the vicinity of 8137 S. Marshfield Avenue in Chicago, Illinois. Following a months-long investigation, defendant was charged with personally discharging a firearm that caused the death of Williams.

¶ 5                                                     Jury Trial

¶ 6        Aja Daily testified that on the evening of February 5, 2014, she and Nikarra Chambers left a party at a downtown Chicago hotel in a car driven by "a guy named Jermaine." Codefendant Daryl Wilson was also in the car. Daily and Chambers got out of the car at a gas station at 81st and Ashland and eventually walked to a nearby bus stop. They were picked up by the same group about an hour later because the busses were not running.

¶ 7        Daily testified at trial that she did not remember hearing gunshots or seeing anyone get shot that night. She claimed that the police fed her "a story" at the police station on March 10, 2015, that she had seen a man being pulled out of a car, robbed, and shot. She went along with the "story" because the police threatened to arrest her and take her daughter away. Daily admitted giving a videotaped statement at the police station but did not remember testifying before the grand jury on June 24, 2015.

¶ 8        Chicago Police Detective Alejandro Almazan testified that Daily voluntarily accompanied him to the police station on March 10, 2015. He denied giving her a "script" to read or telling her what to say. Assistant State's Attorney (ASA) Molly Riordan testified that Daily agreed to make a videotaped statement and never claimed that the police had threatened her or told her what to say.

¶ 9        Daily's videotaped statement was admitted as substantive evidence and published to the

jury. Daily's statement reflects that she and Chambers left the party with codefendant Darryl Wilson, a guy named "Jermaine," and Adarius Hayes. They drove to the gas station in Wilson's car and codefendant Joshua Martin arrived separately in a blue car. Defendant, whom Daily knew from the neighborhood, was at the party but did not leave with them.

¶ 10    Corey Williams pulled into the gas station in a black car. Wilson thought that Williams had "messed with them earlier." He called defendant and told him, "[T]he man was up there at the gas station." As the cars left the gas station, Daily saw defendant wearing all black, "coming out the alley with a hood on and a gun in his hand, and he was shooting at the black car." Daily was "positive it was Cordarius *** I know for a fact that it was him. I seen [*sic*] his hair, his body, everything."

¶ 11    Daily watched the black car speed off, spin out of control, and get stuck in the snow. Wilson and Martin exited their vehicles and approached the black car. They pulled Williams out of the black car, forced him to the ground, and searched his pockets. Williams "scream[ed] for help" until they let him up. As Williams ran down 81st Street, Daily saw defendant in the middle of the street trying to "unjam the gun." Defendant unjammed the gun and began chasing Williams down the road. Daily heard three or four gunshots. After the shots were fired, Wilson got back into the red car and defendant "ran down the other way *** down 80th Street." As Wilson drove down 81st Street, Daily saw Williams lying on the ground on his stomach.

¶ 12    Daily met with Assistant States Attorney (ASA) Molly Riordan prior to testifying before the grand jury on June 24, 2015. Daily never told Riordan that the police had threatened her or told her what to say. Daily's grand jury testimony is consistent with her videotaped statement. Daily reiterated seeing a black car pulling into the gas station shortly after arriving in Wilson's car, hearing Wilson telling defendant that he recognized the driver of the black car, and seeing defendant coming out of an alley wearing all black and holding a gun. She recognized defendant

holding the gun because she could see "the front of [defendant]'s face" and "his hair, his dreads," and nothing was blocking her view. Daily saw Wilson and Martin pulling Williams from the black car and defendant chasing Williams down the road. Daily heard three or four gunshots and saw defendant running "the other way" down the street.

¶ 13        At trial, Nikarra Chambers testified that she knew defendant "from the neighborhood" and had attended a hotel party with Daily on February 5, 2014. Chambers recalled being at the gas station after the party, walking to the bus stop with Daily, and being picked up by Wilson about an hour later. Chambers denied seeing anyone robbed or shot that night. She testified that the police told her what to say at the police station on March 9, 2015, and threatened to take her child and put her in jail if she did not go along with the story. Chambers agreed to give ASA Regina Mescall a videotaped statement at the station, but never told Mescall that the police had threatened her or told her what to say.

¶ 14        Chambers's videotaped statement was admitted as substantive evidence and published to the jury. Her statement reflects that defendant was at the hotel party before the shooting. Chambers left the party in Wilson's car with Daily, Jermaine, and Adarius Hayes, and drove to the gas station. Martin arrived in a blue car as Chambers and Daily went into the gas station to get a drink. Chambers got back into Wilson's car and they left the gas station. Wilson and Martin pulled up to 81st and Marshfield and used their cars to "block[] off" a black car. Wilson and Martin approached the black car and Wilson pulled Williams out of the car. Wilson and Martin forced Williams to the ground and began searching his pockets and the car. As Williams got up and ran away towards 82nd Street, defendant emerged from an alley near 80th and Marshfield wearing all black and began chasing Williams down the road. Shortly thereafter, Chambers heard "two or three" gunshots and saw defendant running back towards 80th and Marshfield. Wilson got back into the maroon car and "was laughing like it was a joke." Chambers did not initially talk to the police

because she was "scared for [her] life," but the police never threatened her or told her what to say.

¶ 15    Chambers met with ASA Sarah Karr prior to testifying before the grand jury on June 24, 2015. Chambers never told Karr that the police had threatened her or told her what to say. Chambers's grand jury testimony is consistent with her videotaped statement. Chambers's grand jury testimony was admitted as substantive evidence and published to the jury. Chambers reiterated seeing defendant emerging from an alley and chasing Williams down the road, hearing two or three gunshots and seeing defendant running back towards the cars after the shots had been fired.

¶ 16    Krystle Chalmers testified that she lived at 1635 West 81st Street on February 6, 2014. Early that morning, she heard cars driving by the intersection of 81st and Marshfield. Chalmers got out of bed because she heard someone "begging for their life." She looked out the window and saw Williams lying on his stomach near an open car door. The car was facing the wrong way down Marshfield and there were three men "pinn[ing]" Williams to the ground.

¶ 17    As Williams got off the ground and ran south down Marshfield, a man in a red jacket with dreadlocked hair aimed a gun at him but "it wouldn't shoot, so maybe the gun was jammed." Chalmers stated that defendant also had dreadlocks, but he was wearing "dark colors" and was taller than the man in the red jacket. Defendant "snatched the gun out of his hand and then started to chase [Williams] down the block." Chalmers lost sight of the men after that but heard "[m]aybe four" gunshots. When the defendant "came back" another man was searching Williams's car. The defendant told the man searching the car that "he got him." The two men got into a car and drove away. When Chalmers called 911 she did not give her name or phone number to the operator because she did not "feel comfortable" and "didn't want to get involved with it."

¶ 18    A recording of Chalmers's 911 call was published to the jury. During the call, Chalmers states "there was just [a] shooting *** on 81st and Marshfield *** The person was running and another person was chasing them." Chalmers told the operator she heard "like four" gunshots.

After being connected to another operator, Chalmers reported seeing a man running while another man chased him with a gun and hearing gunshots.

¶ 19    Although Chalmers told the operator "it was too dark" to see what the gunman was wearing, she explained at trial that she was able to distinguish between the clothing the men were wearing because there was "a light right there on Marshfield, so I was able to see the colors." When asked why she said that on the 911 call, Chalmers responded, "I was probably kind of in shock or something."

¶ 20    On May 12, 2015, Chalmers identified defendant in a photo array as "the shooter." Detective Almazan's report indicates that Chalmers "stated at first she believed the offender with the red jacket chased the victim, but now remembers that he was the one who pulled the gun out first and tried to shoot the victim."

¶ 21    The surveillance video from the gas station showed Wilson's red car pulling into the station near a gas pump and Jermaine and Wilson getting out. Two women (Daily and Chambers) also exited the red car and went into the gas station before returning to the car. Martin's blue car pulled in front of Wilson's car and Martin got out. Williams's black BMW pulled into the station across from Wilson's car. Wilson approached Martin's blue car and leaned into the passenger's side window. The blue car then pulled out of the station. Williams exited his vehicle and entered the gas station. Wilson returned to the red car at the same time Williams got back into his car. The red car backed up, drove around the black BMW, and stopped. As Williams drove off in his black BMW, the red car followed.

¶ 22    Police officers identified Chambers in images from the surveillance video. During her March 9, 2015, interview with Almazan, Chambers provided the names of Daily, Adarius Hayes, and defendant. Defendant was arrested on June 5, 2015.

¶ 23    The medical examiner testified that Williams suffered a gunshot wound to the left chest

that exited the right chest and a gunshot that entered the left hip and was recovered from inside the right chest. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 24 The jury found defendant guilty of first degree murder and of personally discharging a firearm that proximately caused the death of Corey Williams.

¶ 25 At defendant's sentencing hearing, the State emphasized the aggravating nature of the facts, that the defendant had hunted the victim down and committed an unprovoked attack, and defendant's extensive criminal history. Defendant's presentence investigation report ("PSI") detailed a 2007 felony conviction for possession of a stolen motor vehicle and a 2009 felony conviction for unlawful use of weapons by a felon. At the time of this offense, defendant was on parole for a 2011 armed robbery.

¶ 26 In mitigation, defendant's wife testified that her husband was "a provider, a protector and a positive influence on his whole community." Defense counsel argued that defendant's criminal history did not involve "discharging a weapon nor even pointing it at anyone" and submitted "a certificate of completion of a program" while in the Cook County Department of Corrections.

¶ 27 The circuit court sentenced defendant to 50 years' imprisonment for first degree murder, plus a mandatory enhancement of 50 years' imprisonment for personally discharging a firearm that caused Corey Williams's death, for a total of 100 years' imprisonment. In imposing sentence, the circuit court indicated that it had "considered all the factors in aggravation and mitigation." The court specifically noted that defendant's criminal conduct caused and threatened serious physical harm to Corey Williams, "not merely in the final act but in the pursuit of the victim in his vehicle," and that defendant's criminal conduct reflected "increasing levels of seriousness and crimes over time, despite penitentiary sentences and being on parole" at the time he murdered Corey Williams. The court believed that the sentence imposed was "absolutely necessary to deter

others from committing the same crime."

¶ 28                                    ANALYSIS

¶ 29                              Sufficiency of the Evidence

¶ 30        Defendant argues that the State's witnesses were not credible, the witnesses' identifications of defendant were "suggestive," and there was no forensic evidence tying defendant to the shooting. In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 31        To prove defendant guilty of first degree murder, the State was required to establish that, without lawful justification, he intentionally or knowingly shot and killed Corey Williams while armed with a firearm, and that he personally discharged the firearm which proximately caused Williams' death. 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 32        Although there were no eyewitnesses to the shooting, Daily, Chambers, and Chalmers all saw defendant chasing Williams with a gun in his hand immediately prior to hearing gunshots being fired. The gas station surveillance video corroborates the videotaped statements and grand jury testimony of Daily and Chambers. When viewed in the light most favorable to the State, the evidence was sufficient for a reasonable jury to conclude that defendant murdered Williams beyond a reasonable doubt.

¶ 33    Defendant argues that the State's witnesses were impeached by their own prior inconsistent statements and contradicted each other. Prior inconsistent statements admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1 (West 2016)) may alone be sufficient to support a conviction. *People v. Williams*, 332 Ill. App. 3d 693, 696 (2002). Where, as here, such evidence is admitted at trial, it is the duty of the trier of fact to weigh the conflicting statements and determine which are more credible. *Id.* at 697. A reviewing court will not reassess the credibility of the witnesses, reweigh their testimony, or resolve conflicts in the evidence, as those are functions of the jury. *Id*; *People v. Gray*, 2017 IL 120958, ¶ 51.

¶ 34    Defendant also argues that Chalmers's trial testimony was inconsistent with the statements she made to the 911 operator and to the police during the photo array. Chalmers explained that she was probably in shock during the 911 call, and that she was able to clearly see defendant because there was "a light right there on Marshfield." With respect to the photo array, Chalmers "didn't tell the officer that [she] was picking the shooter. [She] was telling the officer that the person with the red jacket, he had the gun first. But the person with the dark colors (defendant) snatched the gun out of his hand." It was the jury's responsibility to accept or reject her testimony. We decline to substitute our judgment for that of the jury with respect to its credibility determinations and the weight given to the testimony of the witnesses. See *People v. Zizzo*, 301 Ill. App. 3d 481, 490 (1998).

¶ 35    Defendant also challenges the reliability of Chalmers's identification testimony. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

¶ 36        Chalmers had a "clear view" of defendant because she was "close, like right there," and there was "a light right there on Marshfield." In addition to attentively watching the events unfolding outside her window, she immediately called 911 to report her unobstructed observations to the police.

¶ 37        Although Chalmers did not give the 911 operator a description of the defendant, she positively identified defendant as the shooter on May 12, 2015, and never wavered in her identification. Even though there was a 15 month delay between the shooting and her initial identification, we have upheld identifications after even longer periods of delay. See, *e.g.*, *People v. Holmes*, 141 Ill. 2d 204, 212 (1990) (18 months); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (16 months). On the whole, the *Biggers* factors weigh in favor of the reliability of Chalmers's identification of defendant as the offender. See *Jackson*, 443 U.S. at 319.

¶ 38        Defendant also argues that the identifications of Daily and Chambers are unreliable because they were only shown a single photo of defendant during the investigation. (Def. Br. 18, 24-26) Both women had known defendant "from the neighborhood" for years and had seen him at the hotel party earlier that night. Where, as here, a witness previously knew the accused, the identification is "strengthened to the extent of the prior acquaintance." See *People v. Jones*, 187 Ill. App. 3d 823, 831 (1989).

¶ 39        In sum, the jury's guilty verdicts were not unreasonable. Although there were no witnesses to the actual shooting, Daily, Chambers, and Chalmers all saw defendant chasing Williams with a gun in his hand immediately before hearing multiple gunshots being fired and seeing Williams lying on the street in a pool of blood. We conclude that this evidence, viewed in the light most favorable to the State, was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt.

¶ 40                                    Closing Argument

¶ 41    Defendant argues that the prosecutor "used rhetoric" during rebuttal argument "for the sole purpose of inflaming the passions of the jury."

¶ 42    The State "is afforded a great deal of latitude in presenting closing argument and is entitled to argue all reasonable inferences from the evidence." *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). However, an argument that serves no purpose but to inflame the jury constitutes error. *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

¶ 43    In rebuttal, the State argued:

> "Ladies and gentlemen, I talked to you about why [defendant] chased after him. Leave no man behind. You just robbed this man or maybe you had some beef with him. Let's silence his voice. They did. He did. He silenced Corey Williams. We talked to you about the evidence in this case being the voice of Corey Williams. *When you go back there and deliberate and return your verdict, you will be the voice of Corey Williams*." (R. 689-90) (Emphasis added).

¶ 44    In *People v. Potts*, 2021 IL App (1st) 161219, we found that comments inviting the jury to "speak for [the victim]," to "be the voice of [the victim]," and to tell the defendant, on the victim's behalf, that "the lies are over, the manipulations are over, the deceit is over, the games are over, you can no longer outrun the evidence in this case," were not improper. *Id.* ¶ 294. See also *People v Favors*, 254 Ill. App. 3d 876, 897 (1993) ("A prosecutor may discuss the evils of crime and to urge the fearless administration of justice."). "A prosecutor may urge the jury to administer justice and may phrase the call for justice as an invocation from the victim." *Potts*, 2021 IL App (1st) 161219, ¶ 294. It was not improper for the prosecutor to do so in this case.

¶ 45    In addition, after initially overruling defendant's objection, the trial court quickly reversed itself and gave the jury a limiting instruction that, "they are not to place themselves in the position of any party in the case. They're independent of any party in the case, and they will make their

own decisions on the case." We find that any alleged error from the prosecutor's comment was cured by the court's thorough admonishment. See *People v. Burton*, 338 Ill. App. 3d 406, 420 (2003) ("The trial court can correct an error by sustaining a timely objection and instructing the jury to disregard the comment."). Taken in context, defendant was not denied a fair trial by the prosecutor's argument.

¶ 46                                    Sentencing

¶ 47        Finally, defendant argues that his 100-year sentence is excessive in light of the evidence in mitigation and violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 48        A trial court has broad discretionary powers in imposing a sentence and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 3d 205, 212 (2010). The trial court is in a superior position "to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The judge "is presumed to consider all relevant factors and any mitigation evidence presented [citation] but has no obligation to recite and assign value to each factor [citation]." *People v. Wilson*, 2016 IL App (1st) 140163, ¶ 11. A reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Alexander*, 239 Ill. 2d at 212. "The seriousness of the crime is the most critical factor in determining an appropriate sentence, not the presence of mitigating factors." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 49        Defendant was convicted of first degree murder, which has a sentencing range of 20 to 60 years. 730 ILCS 5/5-4.5-20 (West 2018). The jury also found that defendant personally discharged a firearm that proximately caused death, which required the imposition of a mandatory firearm enhancement within the range of 25 years to life imprisonment. 730 ILCS 5/5-8-1 (a)(1)(d)(iii).

Where, as here, defendant's 100-year sentence fell within the statutory guidelines, we must presume it is proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 50 The trial court considered all of the statutory the factors in aggravation, including the brutal nature of the crime, defendant's criminal record, and the fact that he was on parole at the time of this murder. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55 (a sentencing court was not required to give a greater weight to mitigating factors than to the severity of the offense). The court also considered all of the statutory factors in mitigation before imposing a sentence that fell within the permissible statutory guidelines. *People v. Snyder*, 2011 IL 111382, ¶ 37. The record shows that the trial court properly exercised its discretion in sentencing the defendant in this case. We decline defendant's request to reweigh the sentencing factors and substitute our judgment for the of the trial court. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 51 Defendant also challenges his sentence under the proportionate penalties clause of the Illinois Constitution. The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. A challenge under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). A sentence violates the clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). We review this issue *de novo*. *People v. Davis*, 2015 IL App (1st) 121867, ¶ 7.

¶ 52 The record reflects that defendant was on parole for armed robbery at the time he targeted, pursued, and executed an unarmed man for no apparent reason. The trial court considered the arguments of counsel, the statutory factors in aggravation and mitigation, the nature and seriousness of the offense, the defendant's criminal history, and the fact that defendant

demonstrated "the exact opposite of rehabilitative potential" in imposing a sentence that fell squarely within the statutory guidelines. See *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010) (the nature and circumstances of the offense and the history and character of defendant are factors that govern rehabilitative potential). Based on the factual record before us, the sentence imposed does not shock the moral sense of the community in violation of the proportionate penalties clause.

¶ 53                                    CONCLUSION

¶ 54        For all of the reasons set forth herein, we affirm defendant's conviction and sentence for first degree murder.

¶ 55        Affirmed.

¶ 56        JUSTICE HYMAN, specially concurring:

¶ 57        The line between reason and capriciousness, between legitimacy and arbitrariness, can be difficult to ascertain, especially when the sentencing judge leaves unarticulated the basis for imposing sentence, as here.

¶ 58        Lawrence's sentencing judge had to consider two statutes with a wide range of choices. The conviction for first-degree murder carries a sentencing range of 20 years to 60 years. 730 ILCS 5/5-4.5-20. The conviction for personally discharging a firearm that proximately caused death has a sentencing range of 25 years or to natural life. 730 ILCS 5/5-8-1(a)(1)(d)(iii). The sentencing judge's discretion necessarily implies a duty—to consider the relevant statutory factors. See *People v. Hill*, 199 Ill. 2d 440, 450 (2002) (discussing *People v. Perruquet*, 68 Ill.2d 149, 154 (1975)).

¶ 59        Lawrence's contention that his 50-year enhancement was excessive requires finding an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The State correctly conceded as much at oral argument. But when asked what factors an appellate court should consider in analyzing whether the sentencing judge abused their discretion, Lawrence and the State had little

to offer. Unfortunately, Lawrence did not raise the issue before the sentencing court or address it in his opening brief. And his reply brief simply asserts the 50-year enhancement was "unduly excessive" due to the weakness of the State's proof. See Ill. S. Ct. R. 341(h)(7) (noting, "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 60    To contest a sentence, appellants must show what the sentencing court considered that it shouldn't have or unduly weighed. *Perruquet*, 68 Ill. 2d at 154-55. Yet, sentencing courts are not required to reveal their reasoning for a sentence or weigh specific mitigating and aggravating factors aloud. See *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 30 (Hyman, J., specially concurring). Although *People v. Butler*, 2013 IL App (1st) 120923, ¶ 42 (Cunningham, J.)*,* upheld the constitutionality of section 5-8-1(a)(1)(d)(iii) against a vagueness challenge, the *Butler* opinion acknowledged that the enhancement "lacks detailed instruction as to where a trial court's sentence should fall within the broad range of the statute." *Id*. ¶ 43. This is an unfortunate reality for appellants like Lawrence for whom the absence of reasons thwarts review.

¶ 61    A fair, consistent, and impartial sentencing structure necessitates an informed defendant and public. When judges do not explain what is behind a sentence, defendants and the public are more likely to perceive judges as making inequitable or biased decisions. "Research shows that when observers are deciding whether a judge's decisions are legitimate, the primary factor is whether they believe the judge made that decision through a fair procedure." *Bryant*, 2016 IL App (1st) 140421, ¶ 33 (Hyman, J., specially concurring) (citing, Tracey L. Meares & Tom R. Tyler, *Justice Sotomayor and the Jurisprudence of Procedural Justice*, 123 Yale L.J. Forum 525, 527 (2014)).

¶ 62    I reiterate my call that sentencing judges make a full record of their sentencing decisions for the benefit of the defendant and the integrity of criminal justice system. *Id*. ¶ 35.

¶ 63    JUSTICE PUCINSKI joins in this special concurrence.